**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DOUGLAS A. TURNS,**

      **Petitioner,**

  **v.**                        **Case No. 2:04-CV-769**
                                   **Crim. No. 2:99-CR-104(1)**
                                   **JUDGE GRAHAM**

**UNITED STATES OF AMERICA,**        **Magistrate Judge KING**

      **Respondent.**

**<u>REPORT AND RECOMMENDATION</u>**

Petitioner, a federal prisoner, brings the instant motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. §2255. This matter is before the Court on the instant motion, petitioner's unopposed motion to amend the petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties.

Petitioner's October 21, 2004, unopposed motion to amend the petition to include additional claims (Doc. No. 134) is **GRANTED**. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that an evidentiary hearing be held as to petitioner's claim that he was denied the effective assistance of counsel due to his attorney's failure to call alibi witnesses, and petitioner's claim that he was denied the effective assistance of counsel because his attorney failed to advise petitioner that he could plead guilty without testifying against the co-defendants in this case. The Magistrate Judge also **RECOMMENDS** that the remainder of petitioner's claims be **DISMISSED.**

**I. FACTS and PROCEDURAL HISTORY**

The facts and procedural history of this case are summarized by the United States Court of

Appeals for the Sixth Circuit as follows:

> Noah Beverly, Douglas A. Turns, and Johnny P. Crockett were indicted for multiple crimes by a federal grand jury, charging them with conspiracy to commit armed bank robbery, in violation of 18 U.S.C. § 371, committing various armed bank robberies, in violation of 18 U.S.C. § 2113(a) and (d), and possessing firearms during and in relation to these crimes of violence, in violation of 18 U.S.C. § 924(c). After two evidentiary hearings, a jury trial commenced in which all three defendants were tried together. On February 8, 2000, the jury returned a verdict of guilty on all counts against Beverly and Turns..... Turns appeals the district court's decision to join his trial with the other two defendants, and further argues that the district court abused its discretion in denying his Rule 14 motion to sever his trial. Turns also contends that the district court abused its discretion in limiting his examination of a government witness, that the district court erred in its denial of his motion for acquittal, and that his sentence of seventy-one and one half years, largely mandated by the requirement of consecutive sentencing under 18 U.S.C. § 924(c)(1)(D)(ii), is cruel and unusual punishment in violation of the Eighth Amendment....

> ### I

> This case is about a series of bank robberies that occurred in Ohio between September 1994 and November 1995. Much of what happened was described by two men who testified at trial: Anthony Lavelle Rogers and his half-brother Melvin Warren, Jr. In each of the seven robberies, either Rogers, Warren, or both, participated in the event and so testified to what occurred. Neither Rogers nor Warren are defendants in this case because they both entered into a plea agreement as part of a guilty plea to armed bank robbery.

> #### *Delaware County Bank and Trust*

> According to Rogers's testimony at trial, on September 26, 1994, Rogers and Turns stole a Chevrolet Blazer from a trucking company and robbed the Delaware County Bank and Trust in Ashley, Ohio on the following day. Turns waited outside, feigning mechanical problems, while Rogers, having borrowed Turns's gun, went inside and robbed the bank. Rogers carried a silver pistol provided by Turns. After the robbery, the two drove to Columbus, Ohio where

2

Turns's sister, Starla Turns, had a house. Rogers claimed he gave Turns $5,000 of the more than $70,000 he took from the vault.

Rogers was dating Starla and he was planning on leaving for Disney World with her the next day, so that night Rogers rented a hotel room near the Columbus airport. When Rogers realized that it would [be] unwise to attempt to take the gun on the airplane, he spoke with Turns about what he should do with it. Turns apparently suggested that Rogers leave it underneath the bushes near the hotel, where Turns could later recover it. Turns has a different version. According to the testimony of FBI Agent Harry Trombitas, Turns told him that he, Turns, had found the gun in his car after having lent the vehicle to Rogers. Turns then informed Agent Trombitas about the weapon, and stashed it under some bushes by this same hotel while waiting for the FBI to come and pick it up. In Florida, while visiting Disney World, Rogers and Starla used various forms of false identification, which were allegedly provided to them by Turns.

Within ten days of the robbery, Lisa Dennis, Turns's girlfriend, made two round-number cash deposits to her bank account. The first deposit, made two days after the robbery, was for $500, and a week later, a second deposit of $600 was made. According to testimony presented at trial, neither Turns nor his girlfriend had a source of income that would explain these deposits. Turns's entire income during this period was apparently derived from unemployment benefits and his girlfriend, Dennis, was only receiving general assistance and funds from Aid to Dependant Children.

Eleven months later, Turns provided details of this robbery to the FBI, but denied his own involvement. Turns placed the amount stolen as between $70,000 and $80,000. The actual amount stolen was $72,500. Turns implicated Rogers, describing his disguise and noting that he had seen Rogers in a white Chevrolet Blazer with Kentucky license plates.

*Park National Bank in Kirkersville, Ohio*

In December 1994, Rogers, his half-brother Melvin Warren, and Turns drove Warren's burgundy Cadillac to a Meijer shopping center in Columbus, Ohio, where Rogers stole a car. The theft was recorded by surveillance cameras. Turns, Rogers, and Warren drove to Kirkersville, Ohio. Rogers and Warren then took the stolen car and drove to the bank, while Turns waited with Warren's Cadillac at a nearby freeway on-ramp. Again, Turns feigned mechanical problems while Rogers and Warren robbed the Park National Bank, with

3

Rogers using a gun he had gotten from Turns. Warren used a gun obtained from Beverly. After robbing the bank, Rogers and Warren drove the stolen car to the freeway on-ramp where they shifted into the Cadillac with Turns. Warren, directed by Turns, drove to Turns's brother's house, where the three counted their take and divided it into thirds.

Several weeks after the robbery, Warren and Rogers were stopped by the police and Rogers used Turns's driver's license as identification. Though Rogers was released, a gun was recovered from the car and Warren was arrested. The ownership of the gun was traced back to Turns, who had purchased the weapon on September 9, 1993. This gun was allegedly provided to Rogers by Turns prior to the Park National Bank robbery.

Eight months after the December 30, 1994 robbery, Turns stated to the FBI that he had been at the aforementioned shopping center with the Meijer store that day with his brother and had happened to see Warren and Rogers there. Turns stated that Warren and Rogers told him details about the robbery later in the day, including the fact that they had taken approximately $35,000. The actual amount stolen was $31,377.

### National City Bank

Another bank robbery occurred five months later, on May 12, 1995, involving Warren, Beverly, and a third man named Colby. Warren testified that while the three of them were drinking at Beverly's house they decided to rob a bank. Warren, Beverly, and Colby parked at a nearby auto-parts store and walked into the National City Bank on Lockbourne Road in Columbus. Once in the bank, they began shouting for everyone to put their hands up. Beverly carried a revolver. The robbery netted $3,428. It was filmed by bank surveillance cameras. Warren identified Beverly as one of the robbers in the surveillance photographs shown at trial.

### Security National Bank

On May 18, 1995, Warren, Rogers, Beverly, and Crockett robbed the Security National Bank in Springfield, Ohio. The four met before the robbery at Beverly's apartment, where they prepared disguises, including masks and bandanas. They then drove together to Springfield in Warren's tan Lincoln Town Car. Once in Springfield, the four drove to a hospital, where Rogers stole a car to use as a getaway vehicle in the robbery. They found an alley behind some

4

buildings across the street from the bank, where they parked the Lincoln. Rogers, Warren, Beverly, and Crockett entered the bank and Crockett, wearing a pair of pantyhose over his head, jumped over the teller's counter and ordered people to the floor. After robbing the bank, the four used the stolen car to get to the alley where the tan Lincoln was parked. They all left their disguises in the stolen car, which was later recovered by the police. The four escaped with $10,538.47.

During the robbery, bank surveillance cameras were working and took several photographs. Both Warren and Rogers were able to identify each other, as well as Beverly and Crockett, in the photos. The government contends that Beverly's pose, disguise, choice of weapon, and use of his left hand is almost identical in the May 18 and the May 12 robbery photos, and that Beverly's revolver, which appears in the pictures, had the same characteristics as the gun recovered after the November 22, 1995 robbery of the Park National Bank in Hebron, Ohio.... The photographs also show a man, identified as Beverly, wearing a "Columbia" hat with holes cut in it as a mask. This hat was later recovered from the abandoned stolen car. It was a hair from this hat that was sent to the lab for the mitochondrial DNA test that was ultimately admitted into evidence at trial.

On July 24, 1995, two months after this robbery, Crockett purchased a 1984 Cadillac for $2,500. Yet, Crockett did not report any income for the year 1995. As part of the bank robbery investigation, FBI Agent Trombitas interviewed Crockett's wife, who identified her husband in the surveillance photo.

*First National Bank*

On July 28, 1995, Rogers, Warren and Turns drove to Zanesville in Turns's BMW. Once in Zanesville, the three drove to a grocery store where Rogers stole a Buick to use as a get-away vehicle. Rogers and Warren took the stolen car to the bank, while Turns drove to a nearby school, their pre-arranged meeting place, and waited. Rogers and Warren entered the bank, both armed. After getting the money, they returned to Turns's car and drove back to Columbus with $41,989. The get-away car was recovered by the police near a school. As it turns out, that same car had been reported stolen from the grocery store where the three had allegedly stopped. In addition, a local resident spotted the BMW near the school during the relevant time period. She identified the make and model, which matched a car that

5

Turns had purchased on May 26, 1995 in Franklin County, Ohio for $5,450.

On the day before the robbery, the balance of the bank accounts of Lisa Dennis, Turns's girlfriend, totaled $24.34. However, her account later showed a deposit made three days after the First National Bank robbery of exactly $1,000. Two days after the First National Bank robbery, Turns and Dennis met with a real-estate agent and put a $5,000 down payment on a house. On August 2, 1995, Turns and Rogers purchased a Porsche in Turns's name with $5,847.23 in cash. Neither Turns nor Dennis filed tax returns in 1994 or 1995.

In the summer of 1995, Turns and his brother went to a gun show with Rogers. They purchased several weapons there. Rogers testified to the fact it was their collective intention to use these weapons in future robberies.

*Huntington National Bank*

Only six days after robbing the First National Bank, on August 3, 1995, Rogers, Turns, and Warren robbed the Huntington National Bank in Marysville, Ohio. Turns drove them to Marysville in his BMW. Contrary to their usual practice, they did not steal a car to use as a get-away vehicle, but instead planned to steal a get-away car at the bank. Once there, Turns dropped the other two off in an alley near the bank and went to a pre-arranged place where they were to meet after the robbery. Rogers and Warren robbed the bank, stole a vehicle, and met Turns at the pre-arranged spot. They abandoned the stolen vehicle and drove back to Columbus with their take of $79,500.

After the Huntington National Bank robbery there were more round-number deposits made to Lisa Dennis's account. Again, Turns described the robbery to the FBI in detail, without mentioning his involvement.

*Park National Bank in Hebron, Ohio*

On November 22, 1995, in Hebron, Ohio, Crockett and Warren robbed the Park National Bank. Crockett and Warren both had guns when they entered the bank and both were wearing disguises. Warren identified both himself and Crockett in the bank surveillance video. After finding dye packs in some of the money they had taken, Crockett began throwing the dye packs at the bank employees, who were lying on the floor. Crockett also fired a shot near the tellers.

Crockett and Warren stole $30,577 from the Park National Bank. While Crockett was in the car waiting with the door open for Warren to come out of the bank, a car pulled into the bank parking lot. Crockett panicked and pulled away, leaving Warren without a means of escape. When Warren emerged from the bank and realized that Crockett had left, he stole a Cadillac.

The chief of police saw the Cadillac pulling away from the bank and left in pursuit, but he ended up losing Warren in the car chase. Eventually, the stolen Cadillac was recovered. Inside the car, the police found some of the money stolen from the bank and a .22-caliber revolver. The revolver turned out to be the same type of gun used by Beverly in the May 12 and May 18 robberies. The police later recovered a .38-caliber bullet from the gun fired by Crockett at the tellers in the bank.

Rogers and Warren were taken into custody by the FBI in August and December of 1995, respectively, partially as a result of information given to FBI Agent Trombitas by Turns. Rogers and Warren eventually cooperated with the FBI, and ultimately Turns, Beverly, and Crockett were indicted on July 20, 1999 and charged with conspiracy to commit armed bank robbery, committing various armed bank robberies, and for the possession of firearms during and in relation to these crimes of violence.

*United States v. Beverly*, 369 F.3d 516-526 (6th Cir. 2004). On June 9, 2000, petitioner was sentenced to an aggregate term of 858 months. *See id.*, at 536; Doc. No. 112. Petitioner filed a timely appeal of his convictions and sentence. He raised the following claims on appeal:

1. The evidence was constitutionally insufficient to sustain his convictions.

2. Improper joinder of his trial with co-defendants Beverly and Crockett.

3. The Court abused its discretion by denying petitioner's motion to sever his trial from co-defendants.

4. The Court abused its discretion by refusing to permit him to cross examine Anthony Rogers regarding Rogers' alleged attempt to molest Turns' twelve year old daughter.

7

    5.  Petitioner's sentence violated the 8th Amendment, and was grossly disproportionate to the crime.

*See id.* On May 12, 2004, petitioner's convictions and sentence were affirmed by the United States Court of Appeals for the Sixth Circuit. *United States v. Beverly, supra*. On October 27, 2004, the United States Supreme Court denied petitioner's petition for a writ of *certiorari*. Doc. No. 135.

    On August 18, 2004, petitioner filed the instant *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. §2255. He asserts the following claims:

    1. Ineffective assistance of counsel.

    A. Counsel failed to explain the correct conditions of government plea offer.

    B. Counsel failed to explain sentence petitioner would receive if petitioner went to trial.

    C. Counsel failed to advise petitioner of his chances of acquittal after counsel's investigation, to accept plea.

    D. Counsel failed to advise petitioner as to the desirability of accepting plea offer.

    E. Counsel failed to discuss advisability of accepting or rejecting plea offer.

    F. Counsel provided petitioner with erroneous legal advice, pretrial.

    G. Counsel failed to call witnesses whose testimony was vital to defense on counts 2, 3 , 16, and 17.

    H. Counsel failed to request any downward departure at sentencing.

    I. Counsel failed to request [jury] instruction on multiple conspiracies.

    2. Evidence was constitutionally insufficient to sustain jury's verdict of guilty as to counts 4 and/or 5.

    3. Government failed to inform defense of witness who saw robbers and getaway car.

8

4. Government paid witnesses with cash, property and leniency for their testimony.

5. Government's knowing use of perjured testimony.

6. District Court erred when ordering restitution.

7. District Court erred when imposing conditions of drug testing and/or treatment part of supervised release.

8. Ineffective assistance of appellate counsel.

9. Federal sentencing guideline amendment "9" should be applied to this case.

10. Evidence was constitutionally insufficient to sustain jury's verdict of guilty as to counts 3, 5, 15, and 17.

On October 21, 2004, petitioner filed a motion to amend the petition, which motion has been granted, to include the following additional claims:

11. Mandatory sentence violates separation of powers.

12. Mandatory sentence violates due process.

13. Mandatory minimum sentence violates petitioner's Sixth Amendment right to trial by jury because it is the result of illegal fact bargaining [sic].

It is the position of the respondent that petitioner's claims are without merit or otherwise procedurally barred from federal habeas corpus review.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to advise him that he could plead guilty without testifying against Johnny Crockett and Ike

Beverly; because his attorney failed to explain the elements of the offenses against him or the sentence he faced; failed to persuade petitioner to accept the government's plea offer; failed to request a continuance at arraignment so that petitioner could hire another attorney; failed to call alibi witnesses; failed to request a downward departure in the sentencing guidelines; and failed to request a jury instruction on multiple conspiracies.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.*, at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*, at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of

counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland,* 466 U.S. at 697.

In response to petitioner's allegations of ineffective assistance of counsel, respondent has attached an affidavit from defense counsel Gary Deeds.  Deeds represented petitioner in two separate criminal cases in this Court, *United States v. Turns,* CR-2-98-13; *United States v. Turns,* CR-2-99-104.  Petitioner was convicted after trial in both cases.[1]  Counsel states in his affidavit in pertinent part:

> 2.  In the course of my representation... I had numerous discussions with [petitioner] concerning the government's interest in pursuing a plea.

> 3.  At all times... he expressed no interest in a plea agreement and continuously expressed his desire to go to trial.

> 4.  Prior to the bank robbery trial, CR-2-99-104, in January 1999 [sic], I discussed the ramifications of convictions on multiple counts of 18 U.S.C. §924(c).  I specifically pointed out that he would be facing the equivalent of a life sentence.  He responded to this discussion by indicating his continued desire to go to trial and profess his innocence.

> 5.  I brought to the attention of Douglas Turns, the offer of the government that a plea agreement might result in a term of ten years in federal prison.  Douglas Turns responded with a statement, in essence, that ten years was the same to him as a life sentence.

> 6.  On more than one occasion after the indictment, my explicit advice to Douglas Turns was to take the pleas offered by the government, and he refused to consider a plea and indicated he wanted a trial.

> 7.  In the first trial, [*i.e.,* the 1998 trial on the earlier criminal prosecution of petitioner] two witnesses, Anthony Rogers and Warren, testified against the defendant and he was convicted.  Prior

---

[1]A petition to vacate, under 28 U.S.C. §2255, is pending in each case.

to the second trial, I indicated to Mr. Turns that the jury believed Rogers and Warren the first time and thus he had to consider that it was likely the jury would believe him [sic] the second time. I also indicated that the stakes were much higher due to the gun charges under 18 U.S.C. §924(c). Mr. Turns responded by indicating his continued desire to go to trial.

8. I estimate that prior to the bank robbery trial in January 1999 [sic], I had a[t] least a half a dozen (or more) conversations with Mr. Turns regarding the plea interest of the government. All conversations resulted in the same assertion by Mr. Turns that he wanted a trial.

\*\*\*

10. I did not discuss with Mr. Turns the possibility of an *Alford* plea.

11. In one of my discussion[s] with Mr. Turns, I explained to him that because of the gun charges (18 U.S.C. §924) he was looking at the equivalent of a life time term. His response was that he was innocent and wanted to take the matter to trial.

12. Douglas Turns did ask for more time before trial. I did not agree that it was necessary or beneficial, believing that the government would seek to revoke Mr. Turns' bond if he moved for a continuance.

13. At the request of Mr. Turns, I utilized at trial the alibi witnesses provided to me by Mr. Turns. I do not recall the existence of any other alibi witnesses.

14. I did not consider filing a motion for a downward departure based on Mr. Turns' role in the offense because the threat to Mr. Turns was from the 65 year mandatory sentence for the 924(c) counts. Any downward departure in Mr. Turns' sentence for his four bank robbery convictions would have had only a minimal overall effect. Also, I do not believe the departure would have been granted.

15. I did not believe a jury instruction on multiple conspiracies was important or significant. At the time, I focused more on the severance issue. I do not believe that an instruction on multiple conspiracies would have helped Mr. Turns.

Exhibit A to Return of Writ.  Respondent has also attached a letter from Deeds to petitioner dated

January 5, 2000, *i.e.,* shortly before the trial in this action, in which Deeds indicates:

> ... [I]n light of the adverse decision by the 6th Circuit, Mr. Marous has
> asked me if you would now consider a plea agreement in which you
> would probably be looking at 10 years imprisonment on the bank
> robbery case as opposed to a potential of 60 if we lose.

Exhibit B to Return of Writ.[2]  Respondent has also attached a copy of a letter dated June 3, 2000,

written by petitioner to the public defender's office, in which petitioner indicates in relevant part:

> In December 1996 the federal attorneys offered me a deal.  Serve 10
> years in prison or go to trial and face 100 years in prison.  I had not
> done anything, so needless to say, I turned them down.
>
> ***
>
> My court appointed lawyer was on their side.  He wanted to plea [sic]
> and take the deal....
>
> Even with all the odds against me I walked into court for two weeks
> to defend myself.  I could have ran at any time but I put my faith in
> the Federal Justice System....
>
> ***
>
> I am now sitting in jail waiting to be sentenced to prison.  Federal
> Laws say that I must receive between 70 and 100 years in prison....

Exhibits C and E to Return of Writ.

Petitioner has failed to establish the ineffective assistance of counsel under *Strickland* due

to his attorney's failure to request a continuance at arraignment so that petitioner could attempt to

hire another attorney.  Petitioner's allegation that the other attorney might have been able to

negotiate a more favorable plea bargain is speculative at best.  Moreover, the Sixth Amendment right

---

[2]The letter apparently refers to the decision of the court of appeals, in petitioner's other criminal case,
reversing the district court's grant of a new trial and remanding the case for sentencing.

to counsel " does not guarantee that a criminal defendant will be represented by a particular attorney." *United States v. Green*, 388 F.3d 918, 919 (6th Cir. 2004), citing *Caplin & Drysdale v. United States*, 491 U.S. 617, 624 (1989); *see also Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993). Although a criminal defendant who can afford to retain his own attorney should be given a fair opportunity to do so, *Serra v. Michigan Department of Corrections, supra*, 4 F.3d at 1351, citing *Powell v. Alabama*, 287 U.S. 45, 53 (1932), the record does not reflect that petitioner was denied the opportunity to do so. He could have hired another attorney regardless of whether counsel requested a continuance at arraignment.

Petitioner also asserts that his attorney failed to call alibi witnesses Anthony Trinca, Melvin Cobb and Stanton Cordell. In support of this claim, petitioner has attached the affidavit of Anthony Trinca which indicates:

> I, Anthony Trinca, saw Douglas A. Turns at 900 Ruby Ave. Apt. A on August 3, 1995 at 9:00 a.m., he was there cleaning up doing repairs on the apartment to get his deposit back.
>
> Then I left and returned around 11:30 a.m. and stayed there with him in the apartment until he was done at 1:00 p.m. We then went to my house and I paid him his deposit of $580.00.

Exhibit 7 to *Petition*. Petitioner has also attached the affidavit of Mel Cobb which indicates:

> I, Mel Cobb, of 1939 Cleveland Ave. was present with Douglas Turns and Laurencine Alexander at the beauty shop of Ms. Darlene Mathews on Cleveland Ave. on September 27, 1994, between the hours of 9:00 a.m. and 12:00 noon at which time I left Ms. Alexander, and Mr. D. Turns.
>
> I know the date because Mr. Turns loaned me $500.00 cash to purchase school clothes for my children. If you have any questions, please feel free to contact me at [illegible].

Exhibit 11 to *Petition*. Petitioner has also attached the affidavit of Stanton Cordell which indicates:

14

> This statement is to let all concerned, [sic] that on September 26, 1994, I, Stanton Cordell, was in possession of one 1987 Blazer two tone gray with two doors owned by Douglas A. Turns.  I installed a water pump, and winterized the above Blazer.
>
> I received the above Blazer sometime in the late morning before noon on September 26, 1994, at my place of employment, 525 Kennedy Dr., Columbus, Ohio 43215.
>
> I finished repairs on Mr. Douglas Turns' Blazer September 27, 1994, in the evening hours.  Mr. Douglas Turns picked his Blazer up between 8:00 p.m. and 9:00 p.m. September 27, 1994.

Exhibit 12 to *Petition*.  Petitioner alleges that these individuals -- had they been called to testify -- would have corroborated his alibi defense and discredited the testimony of Anthony Rogers and Melvin Warren, the co-defendants who testified against him pursuant the terms of their guilty pleas.

The Huntington National Bank in Marysville, Ohio, was robbed on August 3, 1995.[3]  *Id.*, at p. 761. Rogers said that he and his brother, Melvin Warren, robbed this bank with petitioner again acting as the getaway driver.  *Id.*, at pp. 946-50.  According to Rogers, petitioner drove Rogers and Warren to a nearby area in his "BMW with the BBS rims"[4] and then waited for them.  *Id., see also id.,* at pp. 952, 953.

Petitioner denies involvement in this robbery.  According to petitioner, on the day of the Huntington National Bank robbery, he was  at his apartment on 900 Ruby, cleaning the apartment in order to obtain return of his security deposit.  *Id.*, at p. 2021.  Petitioner said that he was at his apartment from 10:00 a.m. until noon, at which time he met the landlord, Mr. Trinca.  *Id.*, at p. 2022.

---

[3]  The Court is unable to determine from the record the exact time the Marysville bank was robbed.

[4]  According to petitioner, he bought the car in April or May 1995, with money from his "BWC" checks. *Id.*, at p. 2011.

Petitioner then went with Trinca to Trinca's house where he obtained his security deposit of $580.00. *Id.*, at p. 2021.

The Delaware County Bank in Ashley, Ohio, was robbed on September 27, 1994, at approximately 10:50 a.m. *Transcript*, at pp. 215, 218. A 1989 Chevrolet Blazer, reported stolen between September 26, 1994, at 3:30 p.m. and September 27, 1994, at 11:00 a.m., was used in the offense. *Id.*, at pp. 221, 224. Rogers testified that he and Turns drove to Cincinnati the night before the Delaware County Bank robbery, on September 26, 1994, to steal a car to use in robbing the bank. Rogers and Turns drove to Cincinnati in petitioner's gray Chevrolet Blazer. *Id.*, at pp. 884, 1066. Rogers stole a Chevrolet Blazer, and followed Turns back to Columbus in the stolen vehicle. Rogers parked the stolen Blazer behind the house where he was staying at the time. *Id.*, at pp. 882-83. The following day, Rogers used the stolen Blazer to rob the bank, and abandoned the stolen vehicle afterwards, making his getaway with petitioner who waited for Rogers in another car.[5] *Id.*, at pp. 883-84. Defense witness Laurencine Alexander, petitioner's sister, said that she met petitioner at 8:30 a.m. on September 27, 1994, the day of the Delaware County Bank robbery, in connection with work. *Id.*, at pp. 1884-85. Mel Cobb was also there. *Id.*, at 1886. They were removing debris from a building. *Id.* She worked from 8:30 a.m. until 3:00 p.m., and petitioner was present the entire time. *Id.* Petitioner testified in his own behalf, and denied any involvement in any of the robberies. According to petitioner, on the day of the Delaware County Bank robbery he was overseeing a

---

[5] Starla Turns, who was living with Rogers at the time, saw the apparently stolen Blazer parked in her back yard. *Id.*, at p. 1866. She first noticed the car at night. *Id.* According to Starla, at 8:00 a.m. the next morning, Rogers drove the vehicle away, and Melvin Warren followed. *Id.*, at p. 1867. On cross-examination, Rogers said that petitioner borrowed Starla's car to use as the getaway vehicle in the Delaware County Bank robbery. *Id.*, at p. 1066.

remodeling job at the Beauty All Over beauty shop for Darlene Matthews[6] with Alexander and Cobb. *Id.*, at pp. 2001-02. He remained at that location from 8:30 a.m. until 3:30 p.m. *Id.*, at p. 2002.

In this case, petitioner offers specific factual detail about additional alibi witnesses not called to testify at his trial. The affidavit of petitioner's trial counsel indicates merely that he does not "recall the existence of any other alibi witnesses" not called to testify. Exhibit A to Return of Writ.

An evidentiary hearing is not required where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Smith v. United States*, quoting *Fontaine v. United States,* 411 U.S. 213, 215, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973) (citation omitted) and citing *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir.1996). The current record cannot be said to satisfy this standard. Petitioner has alleged facts which, if true, may entitle him to relief under the test set forth in *Strickland*. Further, upon review of the record, the Court is unable to conclusively determine that petitioner is not entitled to relief on this claim. In view of all of the foregoing, the Magistrate Judge **RECOMMENDS** that an evidentiary hearing be held as to petitioner's allegation that he was denied the effective assistance of counsel due to his attorney's failure to call alibi witnesses.

Petitioner also asserts that he was denied the effective assistance of counsel during plea negotiations.

> Defendants have a constitutional right to effective assistance of counsel during plea negotiations. *Hill v. Lockhart,* 474 U.S. 52, 58-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The two-prong ineffective assistance of counsel analysis that the Supreme Court announced in

---

[6] Matthews did not testify at trial, and petitioner does not contend that she would have testified for the defense.

> *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d
> 674 (1984), applies to claims that counsel's performance was
> constitutionally deficient during plea negotiations. *Hill,* 474 U.S. at
> 58, 106 S.Ct. 366. A petitioner who claims that he was denied
> effective assistance of counsel with regard to whether or not to plead
> guilty must prove that (1) counsel rendered constitutionally deficient
> performance, and (2) there is a reasonable probability that but for
> counsel's deficient performance, the petitioner would have pled
> guilty. *Magana v. Hofbauer,* 263 F.3d 542, 547- 48 (6th Cir.2001)
> (citing *Turner v. Tennessee,* 858 F.2d 1201, 1206 (6th Cir.1988)). "A
> reasonable probability is a probability sufficient to undermine
> confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct.
> 2052.

*Humphress v. United States*, 398 F.3d 855, 859 (6th Cir. 2005).  An attorney's failure to convey a

plea offer satisfies the first prong of *Strickland*.  *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir.

2003).  Further, a substantial disparity between the plea offer and the potential sentence exposure

constitutes

> strong evidence of a reasonable probability that a properly advised
> defendant would have accepted a guilty plea offer, despite earlier
> protestations of innocence. *See Magana v. Hofbauer,* 263 F.3d 542,
> 552-53 (6th Cir.2001) (finding the difference between a ten- and
> twenty-year sentence significant); *United States v. Day,* 969 F.2d 39
> (3d Cir.1992) (finding ineffective assistance of counsel when trial
> counsel mistakenly described the penalties at trial as ten years rather
> than the twenty-two years the defendant received at sentencing, and
> where a plea offer of five years had been made); *United States v.
> Gordon,* 156 F.3d 376, 377- 81 (2d Cir.1998) (holding that the wide
> disparity between the ten-year sentence recommended by the plea
> agreement and the seventeen-and-a-half years the defendant did
> receive was objective evidence that a plea would have been
> accepted).

*Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003); *see also Griffin v. United States, supra*,

33 F.3d at 739 (evidentiary hearing warranted to determine whether defendant would have pleaded

guilty where attorney failed to convey plea offer of five years and defendant sentenced to 156

18

months.)  However, counsel's failure to insist that his client accept the government's plea offer due to overwhelming evidence of guilt does not constitute constitutionally ineffective assistance.  *Smith v. United States, supra*, 348 F.3d at 552.

> The decision to plead guilty--first, last, and always--rests with the defendant, not his lawyer. Although the attorney may provide an opinion on the strength of the government's case, the likelihood of a successful defense, and the wisdom of a chosen course of action, the ultimate decision of whether to go to trial must be made by the person who will bear the ultimate consequence of a conviction.

*Id*.  The United States Court of Appeals for the Sixth Circuit has described the obligations of defense counsel as it relates to advice during the plea negotiations stage as follows:

> A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available. In a system dominated by sentencing guidelines, we do not see how sentence exposure can be fully explained without completely exploring the ranges of penalties under likely guideline scoring scenarios, given the information available to the defendant and his lawyer at the time.

*Id.*, at 553, citing *United States v. Day,* 969 F.2d 39, 43 (3d Cir.1992).

That said, petitioner's allegations that his attorney failed to convey the government's plea offer, failed to advise petitioner to accept the government's plea offer, and failed to explain applicable sentencing ramifications is simply incredible in view of the record before this Court.  On January 5, 2000, trial counsel asked petitioner if he would "now consider a plea agreement in which you would probably be looking at 10 years imprisonment... as opposed to a potential of 60 if we lose."  Exhibit B to Return of Writ.  Additionally, on June 3, 2000, petitioner wrote the public

defender that he was offered a deal to "serve 10 years in prison or go to trial and face 100 years," that his attorney "wanted to plea and take the deal," and that "even with all the odds against me I walked into court for two weeks to defend myself." Exhibits C and E to Return of Writ. Further, defense counsel indicates in his affidavit that he explained to petitioner on more than one occasion that, if convicted, petitioner faced "the equivalent of a life time term." Exhibit A to Return of Writ. In view of the foregoing, this Court concludes that petitioner was aware of the sentence he faced, and was advised by defense counsel that he should accept the government's plea offer.

However, petitioner also asserts that he did not know that he could plead guilty without testifying against Crockett and Beverly. The record is unclear as to whether petitioner could have accepted the government's plea offer of ten years incarceration without testifying against Crockett and Beverly, or whether trial counsel discussed this aspect of the plea agreement with petitioner. Again, therefore, because petitioner has alleged facts which, if true, may entitle him to relief, and because the Magistrate Judge is unable to conclusively determine from the record before this Court that petitioner is not entitled to relief, the Magistrate Judge **RECOMMENDS** that an evidentiary hearing be held on petitioner's allegation that he was denied the effective assistance of counsel due to his attorney's failure to advise him that he could plead guilty without testifying against co-defendants or cooperating with the government.

Petitioner next asserts that he was denied the effective assistance of counsel because his attorney failed to request a downward departure from the sentencing guidelines based upon petitioner's minor role in the offense. As previously noted, trial counsel states that he did not seek a motion for downward departure based upon petitioner's role in the offense "because the threat to Mr. Turns was from the 65 year mandatory sentence for the 924(c) gun counts" and because

any downward departure in Mr. Turns' sentence for his four bank robbery convictions would have had only a minimal overall effect. Also, I do not believe the departure would have been granted.

*Affidavit of Gary Deeds, Exhibit A* to *Return of Writ*.

§3B1.1 of the United States Sentencing Guidelines provides:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

*Id.* The Application Notes to §3B1.1 provide in relevant part:

3. Applicability of Adjustment.

(A) Substantially Less Culpable than Average Participant. This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant.

\*\*\*

(C) Fact-Based Determination. The determination whether to apply subsection (a) or subsection (b), or an intermediate adjustment, involves a determination that is heavily dependent upon the facts of the particular case. As with any other factual issue, the court, in weighing the totality of the circumstances, is not required to find, based solely on the defendant's bare assertion, that such a role adjustment is warranted..

4. Minimal Participant. Subsection (a) applies to a defendant described in Application Note 3(A) who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group.

21

Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant. It is intended that the downward adjustment for a minimal participant will be used infrequently.

5. Minor Participant. Subsection (b) applies to a defendant described in Application Note 3(A) who is less culpable than most other participants, but whose role could not be described as minimal.

The defendant bears the burden of "proving mitigating factors justifying a reduction for being a minor participant by a preponderance of the evidence." *United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995)(citation omitted). "An adjustment is not appropriate in the absence of a finding that the defendant was 'substantially less culpable than the average participant' in the criminal enterprise." *Id*., citing *United States v. Smith*, 918 F.2d 664, 669 (6th Cir. 1990). Petitioner has failed to meet this standard.

The evidence established that petitioner took part in the planning of the robberies, effectuated the escape and shared in the proceeds of the crimes. Petitioner provided the firearm that was used to rob a bank in Kirkersville, Ohio. *Transcript*, at 1452, 901, 911. Petitioner assisted co-defendants in stealing cars for use in the bank robberies. Petitioner went to a gun show in the summer of 1995 to buy guns for use in future bank robberies. *Id*., at 961-963.

The Sixth Circuit has upheld decisions to deny § 3B1.2 reductions, in whole or in part, to getaway drivers of robberies who engaged in the planning of, or knew the scope of, the robbery. *See, e.g., United States v. Lowery*, 60 F.3d 1199, 1202 (6th Cir.1995) (finding that a minor participant reduction was unavailable for a getaway driver who failed to participate in the actual robbery of a bank, but nevertheless actively participated in the development of the criminal scheme).

22

*United States v. Harris*, 47 Fed. Appx. 322, unpublished, 2004 WL 1859513 (6th Cir. Aug. 18, 2004).  *See also United States v Brown,* 55 Fed. Appx. 753, unpublished, 2003 WL 343245 (6th Cir. Feb. 11, 2003) (role as getaway driver pivotal and necessary for success of robbery); *United States v. Patton,* 14 Fed. Appx. 450, unpublished, 2001 WL 777411 (6th Cir. July 5, 2001); *United States v. Dale,* 187 F.3d 638, unpublished, 1999 WL 618069 (6th Cir. Aug. 2, 1999); *United States v. Cottrell,* 1999 WL 107944 (6th Cir. Feb. 9, 1999).  Such are the circumstances here.  Additionally, as noted by defense counsel, a motion for a downward departure based upon petitioner's allegedly minor role in the offense would, in any event,  not have affected the minimum mandatory sentence required for convictions under 18 U.S.C. §924(c).  In view of all of the foregoing, this claim is without merit.

Lastly, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to request a jury instruction on multiple conspiracies[7] where, petitioner argues, the evidence showed the existence of multiple conspiracies, but not a single conspiracy as charged in count one of the indictment.

Petitioner's argument is unpersuasive.  Petitioner cannot establish prejudice under the second prong of *Strickland* based upon his attorney's failure to request a special jury instruction regarding multiple conspiracies.

_____

[7] An example of a jury instruction on multiple conspiracies would be as follows:

If you find that the conspiracy charged did not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed.

If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though the defendant may have been a member of some other conspiracy.

*United States v. Robison*, 205 F.3d 1342, n.3,  unpublished, 2000 WL 191852 (6th  Cir. Feb. 11, 2000).

> [A]ctual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice....
>
> Even if a defendant shows that particular errors of counsel were unreasonable... the defendant must show that they actually had an adverse effect on the defense.
>
> It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, *cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 866-867, 102 S.Ct. 3440, 3446-3447, 73 L.Ed.2d 1193 (1982), and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding....
>
> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland v. Washington, supra*, 466 U.S. 693-94.  Petitioner cannot meet this standard here.

The United States Court of Appeals for the Sixth Circuit rejected petitioner's argument that the evidence was constitutionally insufficient to sustain his conviction on conspiracy to commit armed bank robbery.  Additionally, and contrary to petitioner's argument here,

> a single conspiracy is not converted into multiple conspiracies merely because there may be some changes in persons involved or because they play different roles.

*United States v. Rugiero,* 20 F.3d 1387, 1391 (6th Cir. 1994), citing *United States v. Rios,* 842 F.2d 868, 872 (6th Cir.1988); *United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979).

> Each member of a conspiracy need not be shown to know each other or to have direct association with all other conspirators.  *United States v. Sanchez,* 928 F.2d 1450, 1457 (6th Cir.1991)....[P]roof of a

24

> formal agreement is unnecessary. A tacit or mutual understanding and a showing of knowing and active participation by a defendant in some act or portion of the conspiracy is all that is required. *United States v. Lee,* 991 F.2d 343, 347-48 (6th Cir.1993).
>
> The fact that a conspiracy can be divided into distinctive sub-groups does not mean that there is more than one conspiracy. As long as the different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy. *United States v. Warner,* 690 F.2d 545, 550 n. 8 (6th Cir.1982).

*United States v. Rugiero, supra*, 20 F.3d at 1391-92.

Further, the record indicates that the jury was properly instructed on the elements of the offense of conspiracy to commit armed bank robbery as charged in count one of the indictment. Petitioner does not allege, nor does the record reveal, any error in the jury instructions. Finally, as noted by the respondent, petitioner's sentence on count one was ordered to run concurrently with the other sentences imposed.

### III. CLAIMS TWO and TEN

In claims two and ten, petitioner asserts that the evidence is constitutionally insufficient to sustain his convictions. Such claim is not appropriate in a §2255 proceeding. *United States v. Osborn*, 415 F.2d 1021, 1024 (6th Cir. 1969)(*en banc*). Further, this claim has already been considered and rejected by the United States Court of Appeals for the Sixth Circuit. *See United States v. Beverly, supra*. Therefore, the Court will not now again consider these claims here. *See Jones v. United States,* 178 F.3d 790, 796 (6th Cir. 1999), citing *Oliver v. United States*, 90 F.3d 177, 180 (6th Cir. 1996) and *Davis v. United States*, 417 U.S. 333, 345 (1974); *Jones v. DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996).

## IV.  CLAIM THREE

In claim three, petitioner asserts that the government improperly failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  Petitioner specifically alleges:

> [The] government did not turn over statement[s] or name[s] of witness[es] who claim[ ] to have seen the robbers and getaway car.  Petitioner has obtained three statements thr[ough] F.O.I.A. and the statements would have been helpful to the defense.

*Petition,* at 8.  Petitioner provides no further details regarding this claim.  Nothing in the record before this Court supports petitioner's allegation, nor does it appear that any evidence outside the record supports petitioner's allegation.  Claim three is without merit.

## V.  CLAIMS FOUR and FIVE

In claims four and five, petitioner asserts that he was denied a fair trial due to prosecutorial misconduct.  Petitioner alleges that the government improperly paid unnamed witnesses for their testimony, promised them leniency and cash, and other unspecified improper promises, in return for their testimony against petitioner.  Petitioner also alleges that the government knowingly submitted the perjured testimony of co-defendants Rogers and Warren in order to secure convictions against him.  Again, petitioner's conclusory allegations are completely without support.  Claims four and five are without merit.

## VI.  CLAIMS SIX, SEVEN and NINE

In claim six, petitioner asserts that the Court erred in imposing restitution.  In claim seven, petitioner asserts that the Court erred in imposing drug testing and treatment as a condition of his

supervised release.  In claim nine, petitioner asserts that Amendment 9 of the United States

Sentencing Guidelines should apply to his convictions on 18 U.S.C. §924(c).  All of these claims

should have been raised on direct appeal, but were not.  Therefore, before such claims will be

entertained on collateral review, petitioner must show cause why he did not previously raise such

issues, and "actual prejudice" resulting from the alleged errors.  *Napier v. United States*, 159 F.3d

956, 961 (6th Cir. 1998), citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982).

The Court presumes that petitioner asserts, as cause for his procedural default, the ineffective

assistance of counsel.  Attorney error may constitute cause if it amounts to ineffective assistance of

counsel .  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Because petitioner did not object to any of

the foregoing issues at sentencing, such errors would be reviewed on appeal for plain error only.

*United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998)(citations omitted); Fed.R.Crim.P.

52(b).

> "Plain errors or defects affecting substantial rights may be noticed
> although they were not brought to the attention of the court."
> Fed.R.Crim.P. 52(b). To establish plain error, a defendant must show
> (1) that an error occurred in the district court; (2) that the error was
> plain, i.e., obvious or clear; (3) that the error affected defendant's
> substantial rights; and (4) that this adverse impact seriously affected
> the fairness, integrity or public reputation of the judicial proceedings.
> *Johnson*, 117 S.Ct. at 1549; *United States v. Thomas*, 11 F.3d 620,
> 629-30 (6th Cir.1993).

*Id.*

For the reasons that follow, petitioner cannot meet this standard here.  Petitioner therefore

has failed to establish cause and prejudice for his procedural default of claims six, seven, and nine.

Petitioner first asserts that he was denied the effective assistance of counsel due to his

attorney's failure to raise on direct appeal an issue regarding restitution.  The *Strickland* test applies

27

to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

Petitioner complains that the co-defendants were not held responsible for any of the restitution for the bank robberies in which they were involved. *Traverse,* at 9. However, the record does not support this claim. Petitioner was ordered to pay $224,866.00 of restitution jointly and severally with the co-defendants. *See* Doc. No. 112.

Petitioner next asserts that he was denied the effective assistance of counsel because his attorney failed to raise on appeal an issue that the Court erroneously imposed drug testing and treatment as a condition of his supervised release. Among the conditions of petitioner's supervised release are the requirements that petitioner not illegally possess or use a controlled substance and submit to one drug test within 15 days of his release from imprisonment and to at least two periodic drug tests thereafter. Doc. No. 116. These conditions are proper under 18 U.S.C.A §3583(d), which provides in pertinent part:

> d) Conditions of supervised release. -- . . . The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance. ... .

*Id.; see also United States v. Carter,* 159 F.3d 397, 400 (9th Cir. 1998). Further, a district court is given "broad discretion in imposing special conditions of supervised release" and "may order a

28

variety of discretionary conditions of supervised release." *United States v. Guy*, 174 F.3d 859, 861 (7th Cir. 1999), quoting *United States v. Schechter*, 13 F.3d 1117, 1118 (7th Cir.1994).

Finally, petitioner asserts that "federal sentencing guideline amendment 9 of 2000 should apply to the 18 U.S.C. §924(c) charges in counts 5, 15, and 17." *Petition*, at 9. Petitioner is apparently referring to Amendments 598, 599 and 600, effective November 1, 2000, to Section 2K2.4 of the United States Sentencing Guidelines, *see Appendix C, Volume II*, which provides:

> Use of firearm, armor-piercing ammunition, or explosive during or in relation to certain crimes
>
> (a) If the defendant, whether or not convicted of another crime, was convicted of violating:
>
> ***
>
> (2) Section 924(c)... of title 18, United States Code, the guideline sentence is the minimum term of imprisonment required by statute.

U.S.S.G. §2K2.4. The Application Notes state in part that:

> 1. ... Section[] 924(c)... of title 18, United States Code, provide[s] mandatory minimum terms of imprisonment.... Accordingly, the guideline sentence for a defendant... convicted under 18 U.S.C. §924(c) is the minimum term required by the relevant statute. ... 18 U.S.C. ... §924(c)... requires a term of imprisonment imposed under this section to run consecutively to any other term of imprisonment.

Petitioner was sentenced on his convictions for aiding and abetting in the use of a firearm during and in relation to a crime of violence in counts 3, 5, 15, and 17, pursuant to the mandatory sentencing provisions of 18 U.S.C. §924(c):

29

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.


(B) If the firearm possessed by a person convicted of a violation of this subsection–

(i) is a short-barreled rifle, short-barreled shotgun, the person shall be sentenced to a term of imprisonment of not less than 10 years; or

(ii) is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, the person shall be sentenced to a term of imprisonment of not less than 30 years.


(C) In the case of a second or subsequent conviction under this subsection, the person shall--

(i) be sentenced to a term of imprisonment of not less than 25 years; and

(ii) if the firearm involved is a machinegun or a destructive device, or is equipped with a firearm silencer or firearm muffler, be sentenced to imprisonment for life.


(D) Notwithstanding any other provision of law–

(i) a court shall not place on probation any person convicted of a violation of this subsection; and

(ii) no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of

imprisonment imposed for the crime of violence or drug trafficking
crime during which the firearm was used, carried, or possessed.

*Id.*[8]

Neither §2K2.4, nor any of the amendments to that section of the United States Sentencing
Guidelines, would have altered petitioner's sentence on his convictions under §924(c).

Petitioner has failed to establish the ineffective assistance of appellate counsel for failing to
raise any of the foregoing issues on appeal.  Petitioner has likewise failed to establish cause and
prejudice for his failure to raise on appeal such claims on direct appeal.

## VII.  CLAIM EIGHT

In claim eight, petitioner asserts that he was denied the effective assistance of appellate
counsel because his attorney failed to raise on appeal any of the issues presented in this motion to
vacate pursuant to 28 U.S.C. §2255.

Claims of ineffective assistance of trial counsel are properly brought in a §2255 proceeding,
rather than on direct appeal.  *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003).  Further, for
the reasons discussed herein, the remainder of petitioner's claims are without merit.  Therefore,
petitioner has failed to establish the ineffective assistance of appellate counsel under the test set forth
in *Strickland* for failing to raise any of the issues presented in the instant motion to vacate, set aside,
or correct sentence pursuant to 28 U.S.C. §2255.

Claim eight is without merit.

---

[8]  In 1998, the statute was amended to require twenty-five year mandatory minimum, rather than a twenty
year mandatory minimum sentence for a second or subsequent conviction under §924(c).  *See* 1998 Amendments,
Pub.L. 105-386, § 1(a)(1).

## VIII. CLAIM ELEVEN

In claim eleven, petitioner asserts that his mandatory minimum sentences violate the doctrine

of separation of powers.  In *Mistretta v. United States*, 488 U.S. 647 (1989), the United States

Supreme Court rejected this argument.  *See also United States v. Jacobs*, 877 F.2d 460, 461 (6th Cir.

1989).

Claim eleven is without merit.

## IX.  CLAIM TWELVE

In claim twelve, petitioner asserts that the imposition of a mandatory minimum sentence

violates due process.  The United States Court of Appeals for the Sixth Circuit has rejected such

argument:

> [Petitioner] argues that section 924(c) violates due process by
> depriving the sentencing judge of discretion to impose an
> individualized sentence. This contention has no merit since "the
> scope of judicial discretion with respect to a sentence is subject to
> congressional control." *Mistretta v. United States,* 488 U.S. 361, 364,
> 109 S.Ct. 647, 650, 102 L.Ed.2d 714 (1989). Further, Congress can
> constitutionally eliminate all discretion in sentencing judges by
> establishing mandatory sentences like that contained in section
> 924(c). *Id.* at 364, 109 S.Ct. at 650 ("Congress, of course, has the
> power to fix the sentence for a federal crime").

*United States v. Dumas*, 934 F.2d 1387, 1389-90 (6th Cir. 1990).

Claim twelve is without merit.

## X.  CLAIM THIRTEEN

In claim thirteen, petitioner asserts that he was subject to "illegal fact bargaining,"*see*

*Petition*, and improperly penalized for exercising his right to a jury trial because the sentence he

received was substantially greater than that he would have received had he pleaded guilty.  Neither

of these allegations has merit.  It is true that

> [t]he trial court must not penalize the defendant for exercising his
> constitutional right to plead not guilty and go to trial; whether or
> not the defendant exercises his right to trial must have no bearing
> on the sentence he receives.

*United States v. Harris*, 635 F.2d 526, 529 (6th Cir. 1980), citing *United States v. Derrick*, 519 F.2d

1, 3 (6th Cir. 1975).  However,

> a defendant can receive a lesser sentence for choosing to plead guilty.
> "[W]e have repeatedly held that the government may encourage a
> guilty plea by offering substantial benefits in return for the plea;
> *Corbitt v. New Jersey,* 439 U.S. 212, 219, 99 S.Ct. 492, 58 L.Ed.2d
> 466 (1978)" *United States v. Mezzanatto,* 513 U.S. 196, 115 S.Ct.
> 797, 807, 130 L.Ed.2d 697 (1995).
>
> Sentencing Guideline § 3E1.1 recognizes the benefit to the justice
> system from the acceptance of responsibility by providing for up to
> a three level reduction in the offense level for a guilty-pleading
> defendant.

*United States v. Davis*, 170 F.3d 617 (6th Cir. 1999).  In *United States v. Mezzanatto, supra*, 513 U.S.

at 209, the United States Supreme Court stated:

> The plea bargaining process necessarily exerts pressure on defendants to
> plead guilty and to abandon a series of fundamental rights, but we have
> repeatedly held that the government "may encourage a guilty plea by offering
> substantial benefits in return for the plea." *Corbitt v. New Jersey,* 439 U.S.
> 212, 219 (1978). "While confronting a defendant with the risk of more severe
> punishment clearly may have a 'discouraging effect on the defendant's
> assertion of his trial rights, the imposition of these difficult choices [is] an
> inevitable'--and permissible--'attribute of any legitimate system which
> tolerates and encourages the negotiation of pleas.' " *Bordenkircher v. Hayes,*
> 434 U.S. 357, 364 (1978) (quoting *Chaffin v. Stynchcombe,* 412 U.S. 17
> (1973)).

*Id*. Again, petitioner was sentenced in this case pursuant to the United States Sentencing Guidelines and the mandatory minimum requirements of 18 U.S.C. §924(c). There is no indication that he was sentenced based upon any improper factors. Likewise, the record is without support for petitioner's allegation that the government misrepresented any facts or engaged in impropriety by offering petitioner a reduced sentence should he choose to plead guilty.

Claim twelve is without merit.

## XI.

In view of all of the foregoing, the Magistrate Judge **RECOMMENDS** that an evidentiary hearing be held regarding petitioner's allegations that he was denied the effective assistance of counsel due to his attorney's alleged failure to advise him that he could plead guilty without testifying against co-defendants and due to his attorney's alleged failure to call alibi witnesses. The Magistrate Judge **RECOMMENDS** that the remainder of petitioner's claims be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation*.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


August 2, 2005                                            *s/Norah McCann King*
                                                             Norah McCann King
                                                    United States Magistrate Judge

35